Filed 12/18/24  In re L.W. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re L.W. et al., Persons Coming Under the Juvenile Court Law. | D084649 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, Plaintiff and Respondent, v. T.J., Defendant and Appellant. | (Super. Ct. No. J521350A, B) |

APPEAL from orders of the Superior Court of San Diego County, Daniela Reali-Ferrari, Judge.  Affirmed.

Monica Vogelmann, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Natasha C. Edwards, Deputy County Counsel, for Plaintiff and Respondent.

T.J. (Mother)[1] appeals from orders sustaining petitions filed by the San Diego County Health and Human Services Agency (the Agency) under Welfare and Institutions Code[2] section 300, subdivision (b)(1) (§ 300(b)(1)), on behalf of her minor sons, L.W. and M.W. (collectively, the children). Mother contends that substantial evidence did not support the court's jurisdictional findings. She premises this argument largely on her claim that she was not violent. She further contends that the dispositional orders were erroneously made because they were predicated on the jurisdictional findings she challenges. We conclude that substantial evidence supports the jurisdictional findings under section 300(b)(1) and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Between October 2 and November 28, 2023, the children were exposed to multiple violent confrontations between Mother and Father. During the October confrontation, Mother punched Father several times before threatening him with a kitchen knife and attempting to stab him in the presence of the children. Mother denied any violence towards Father. Father sustained minor visible injuries, which Mother claimed were self-inflicted. Mother further denied any knowledge of the knife police recovered at the home and was arrested for child cruelty, assault with a deadly weapon, and spousal abuse. Following the altercation in October, Mother temporarily relocated to Iowa. Father obtained a temporary restraining order and an emergency protective order and stated he would not let Mother return to the home.

---

[1]     D.W. (Father) does not join Mother in this appeal.

[2]     Further undesignated statutory references are to the Welfare and Institutions Code.

Nevertheless, Mother returned in November 2023 and Father allowed her to return to the home and have unsupervised contact with the children. She again became violent with Father in the children's presence, culminating in strangling him. Police responded to Mother's call for assistance and discovered Father with visible injuries. The paternal grandmother was present when police arrived and reported witnessing the interaction, including Mother strangling Father. Mother was identified as the dominant aggressor and arrested for assault and battery. Mother maintained Father was the only aggressor and denied strangling him or otherwise being physically violent with him. She later asserted Father self-inflicted the injuries observed by others.

The October and November altercations were not the only incidents for which the parents sought law enforcement assistance. In the preceding year, police were summoned to the family home at least seven times. Separately, Father has further history with the Agency with his previous partners and has had his parental rights to other children terminated.

Mother acknowledged that she failed to protect the children and allowed them to witness physical violence in the home. She also admitted that she is not level headed and struggles to communicate. In her interactions with a social worker following the November incident, she struggled against a set of handcuffs and began to yell and stomp her feet. She reported a history of alcohol, marijuana, methamphetamine and cocaine use, although Mother discontinued the use of methamphetamine and cocaine prior to the incidents that gave rise to this case. Mother reported "drinking a regular-sized bottle of vodka per day" and micro-dosing marijuana prior to the incidents. She claimed to stop drinking following the October incident, but tested positive for alcohol and marijuana on December 19, 2023; she

continued testing positive for marijuana throughout 2024. She expressed a willingness to discontinue her marijuana use, but ultimately chose to continue her use, citing concern cessation might have a negative impact on her mental health. Mother maintained that she was a victim of Father's domestic violence, describing Father physically and sexually assaulting her over the course of their relationship. She also told a social worker that Father had previously threatened to take the children away from her, and alleged that Father would sexually and physically abuse them if they were left in his care.

Father reported that Mother threatened to kill him and the children prior to the November 2023 incident. He described Mother's behavior during the precipitating incidents as manic and said her manic states lasted anywhere from days to a month. Father received an emergency protective order following the October incident, which he allowed to lapse because Mother was in Iowa. He received another temporary restraining order following the November incident and told a social worker he intended to make it permanent after an initial extension. He agreed to work with the Agency to make a formal safety plan and to keeping Mother separated from the children. Multiple minors made allegations that Father was sexually inappropriate with them, and Father sustained a conviction for sexually abusing a minor. Father admits he was the aggressor in domestic violence incidents with previous partners, who obtained restraining orders against him. He denies assaulting Mother and admits struggling with alcohol around the time of the incidents.

The Agency was concerned that both parents posed a risk to the children's safety and recommended removal of both children. In line with that recommendation, the court ordered removal on December 7, 2023, and

detention on December 12, 2023. Shortly thereafter, Mother completed a six-hour online parenting class, eight-hour drug and alcohol class, and eight-hour domestic violence course. The children moved to a temporary placement on December 7, 2023 but were removed approximately a week later because of aggressive behavior. The caregivers in their second placement also requested their removal after approximately a week. Accordingly, on December 22, 2023, the children moved to the Polinsky Children's Center. The children moved to a caregiver's home in the new year.

Mother and Father's supervised visits with the children were staggered. The restraining order protecting Father from Mother was dismissed on January 16, 2024. Two days later, on January 18, Father called the social worker and expressed concern about entering the building, describing Mother waiting outside in her car. Four days later, Mother obtained a temporary restraining order, protecting her from Father. Father similarly filed for and obtained a new temporary restraining order on February 6. On February 15, Mother was still in the building lobby when Father arrived for his visit. The following day, Mother was served with the new temporary restraining order before her supervised visit with the children. Mother asserted the injuries described and pictured in the temporary restraining order were self-inflicted.

The Agency referred Mother to domestic violence classes, which she agreed to receive. She completed her intake on January 17, 2024, but finished only five sessions over three months. She was inconsistent in her attendance and completing her homework, citing technology issues and being too upset to participate. In April 2024, Mother announced she was quitting the domestic violence group and requested individual therapy instead. She participated in three individual domestic violence therapy sessions between

5

April and June 2024. Mother stated that it took six of the first seven months she was separate from Father to " 'adjust and get a grip.' " Although her attendance in domestic violence programs was erratic, Mother was consistent about accessing therapy and parent counseling. Mother expressed concern about her ability to find housing, but rejected entering a sober living facility. In spite of the progress Mother made with her mental health, she altered the dose of her prescribed psychotropic medications while experiencing a depressive episode, without the supervision of a competent medical professional.

Father similarly participated in domestic violence therapy, alcohol cessation support groups, and individual therapy. The Agency initially recommended bypassing reunification services for Father because his parental rights to the children's half-siblings were terminated. However, in May 2024, following a period of progress in which Father successfully engaged in voluntary services, the Agency recommended Father receive reunification services. After the social worker shared the Agency's new recommendation with Father, he disclosed he was arrested for misdemeanor domestic violence against a friend.

Both parents were consistent with their visits to the children, but both initially ignored requests to limit or omit food from their visits. The food and beverages Mother and Father provided caused nausea, vomiting, diarrhea and diaper rash. Mother admitted pulling the children's foreskin back during visits without reason while inspecting their bodies. She asserted she did this due to her trauma. Mother continued to insinuate that the children might be experiencing sexual abuse.

Although Mother and Father made some progress in their respective voluntary services, the Agency did not believe it was safe for the children to

6

return to either parent. The jurisdictional and dispositional hearing was continued several times before being held in June 2024. At that hearing, Mother and Father contested jurisdiction but submitted on the issue of disposition. In support of her position, Mother submitted a series of exhibits updating the court on her voluntary services and rested. In closing, Mother argued that the allegations contained in the petition regarding her violence towards Father were untrue, and that she made significant progress in her voluntary services. The court found both Mother and Father made minimal progress towards alleviating or mitigating the causes necessitating placement. In accordance with those findings, the court sustained the petition and found jurisdiction over the children under section 300, subdivision (b).

## DISCUSSION

We begin by observing that dependency jurisdiction is taken over the child, not the parent. (§ 300; see *In re Alysha S.* (1996) 51 Cal.App.4th 393, 397.) "[A] jurisdictional finding good against one parent is good against both. More accurately, the minor is a dependent if the actions of either parent bring [the child] within one of the statutory definitions of a dependent." (*In re Alysha S.*, at p. 397.) When allegations in a dependency petition involve both parents, "it is necessary only for the court to find that one parent's conduct has created circumstances triggering section 300 for the court to assert jurisdiction over the child[ren]." (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1491.) This is because the primary concern of the dependency proceeding is "the protection of [the] children," and the focus of the juvenile court's jurisdictional findings is therefore the "children, not [the] parents." (*Ibid.*) Thus, "[a]s a general rule, a single jurisdictional finding supported by

7

substantial evidence is sufficient to support jurisdiction." (*In re. M.W.* (2015) 238 Cal.App.4th 1444, 1452.)

In a dependency proceeding, the Agency must prove by a preponderance of the evidence that the child who is the subject of the petition comes under the court's jurisdiction. (§ 355.) A juvenile court may exert dependency jurisdiction over a child if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm . . . , as a result of . . . [t]he failure or inability of [his] parent . . . to adequately supervise or protect the child." (§ 300(b)(1).)

" 'In reviewing the jurisdictional findings . . . we look to see if substantial evidence, contradicted or uncontradicted, supports them. [Citation.] In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.' " (*In re R.T.* (2017) 3 Cal.5th 622, 633.) On appeal, the parent has the burden of showing that there is insufficient evidence to support the juvenile court's jurisdictional findings. (*In re T.V.* (2013) 217 Cal.App.4th 126, 133 (*T.V.*).)

To establish jurisdiction under section 300(b)(1), the Agency must show "(1) neglectful conduct, failure, or inability by the parent; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness." (*In re L.W.* (2019) 32 Cal.App.5th 840, 848.) The third element requires a showing that at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future. (*In re Jesus M.* (2015) 235 Cal.App.4th 104, 111.) "The [juvenile] court may consider a parent's past conduct as well as present circumstances." (*In re*

8

*N.M.* (2011) 197 Cal.App.4th 159, 170.)  However, standing alone, past conduct is insufficient to establish a substantial risk of harm and "there must be some reason beyond mere speculation to believe [the past conduct] will reoccur." (*In re Ricardo L.* (2003) 109 Cal.App.4th 552, 564-565.)  The court, however, " 'need not wait until a child is seriously abused or injured to assume jurisdiction' " and "[a] parent's past conduct is a good predictor of future behavior." (*T.V., supra*, 217 Cal.App.4th at p. 133.)

The Agency does not argue that the children suffered any physical harm due to Mother and Father's violence.  Accordingly, we consider whether the record contains evidence showing a substantial risk of serious physical harm in the future.

The juvenile court looked not only to Mother's violence during the two incidents that precipitated the dependency case, but to multiple incidents of domestic violence between the parents while they cared for their young children.  In the 10 months leading up to the October 2023 incident, police visited the family on seven separate occasions.  These calls culminated in two incidents for which Mother was arrested.  Although Mother denied attacking Father with a knife, responding police officers discovered one and observed Father's injuries.  The following month, the paternal grandmother witnessed Mother strangling Father and recounted what she saw to the Agency and police.  As such, there are multiple witnesses that corroborate Mother being violent towards Father.  The court also considered Father's May 2024 arrest for domestic violence just weeks before the jurisdictional and dispositional hearing, which the petition was modified to include.

We observe that Mother resisted attending domestic violence group therapy or completing the assigned homework before quitting the group entirely.  As to her individual domestic violence therapy, she attended only a

9

handful of sessions in the three months leading up to the jurisdictional and dispositional hearing. This is a promising start; however, as the court observed, her progress towards mitigating the causes necessitating placement was minimal. Any further participation after the hearing, while laudable, would be inappropriate for us to consider in our review. (*In re Zeth S.* (2003) 31 Cal.4th 396, 405.) Further, although Mother was consistent in accessing mental health services and support, she also increased the dosage of her psychotropic medication without the guidance or supervision of a physician shortly before the jurisdictional and dispositional hearing. We conclude that ample evidence supports the juvenile court's finding that both Mother's and Father's domestic violence endangered the children's physical health and safety and placed them at risk of serious physical harm.

Mother maintains, even now, that she was never the aggressor. In doing so, she asks us to ignore the evidence proffered to the Agency regarding two separate violent incidents, one involving the use of a weapon, and one involving strangulation. She relies on an opinion from the New York Court of Appeals, *Nicholson v. Scoppetta* (2004) 3 N.Y.3d 357, to argue that she, as a victim of domestic violence, is not inherently neglectful. Similarly, in her reply briefing to this court, Mother cites to cases in which jurisdiction was not appropriate where the *victim* of domestic violence demonstrated that their children were not endangered merely by their survivor status. She also urges us to accept that her violent actions were merely a differential response to the trauma she endured and not, themselves, domestic violence. This may be one interpretation of the evidence, but it is not the only reasonable one. In effect, Mother asks us to reweigh the evidence, which is something we cannot do. Her arguments also disregard the fact that Mother was identified as the

perpetrator in the two incidents that gave rise to this case and the finding is supported by substantial evidence.

Mother denied attempting to stab Father or committing any violence towards him during the October 2023 incident. She left the state, then returned and strangled Father in November, an incident she again denies despite the report of a direct witness. These were not the only incidents Mother denied responsibility for; Mother also asserted that Father charged into her lit cigarette and punched himself in the face as explanations for injuries documented in his application for a temporary domestic violence restraining order. Taken together, these reports demonstrate an escalating pattern of domestic violence between Mother and Father, culminating in very serious attacks using a weapon and a strangulation incident. Mother does not acknowledge or recognize this escalating pattern. "One cannot correct a problem one fails to acknowledge." (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197.) "[D]enial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision." (*In re Esmeralda B.* (1992) 11 Cal.App.4th 1036, 1044.) Police intervention was not sufficient to dissuade Mother from further violence and the juvenile court reasonably could conclude Mother would not be dissuaded from violent acts around her children without an active dependency case.

Finally, even if we accept as true Mother's claim that she has never been the perpetrator in the family's domestic violence, the fact remains that the children were repeatedly exposed to violence between the parents. Mother conceded that the children were exposed to violence in the home and that she failed to protect them. Mother's claims about Father's violence towards her bolster a jurisdictional finding. Father has a lengthy history of domestic violence and dependency matters and was arrested for domestic

11

violence approximately one month before the jurisdictional and dispositional hearing. Father's behavior, which Mother complains of, is a sufficient and independent basis for finding jurisdiction because jurisdiction is taken over a child, not a parent. " 'The purpose of dependency proceedings is to prevent risk, not ignore it.' " (*Jonathan L. v. Superior Court* (2008) 165 Cal.App.4th 1074, 1104.) The record, viewed most favorably to the juvenile court's orders, establishes that Mother's history of physical abuse towards Father, her acknowledged failure to protect the children, and her inconsistent participation in a domestic violence cessation program constitute substantial evidence that the children remained at risk of substantial physical harm. Accordingly, the juvenile court appropriately assumed jurisdiction over them under section 300(b)(1).

Mother's claim regarding the dispositional orders is based on error with the jurisdictional findings. Because the jurisdictional findings are supported by substantial evidence, we need not address Mother's argument regarding those dispositional orders.

## DISPOSITION

The orders are affirmed.

IRION, J.

WE CONCUR:

O'ROURKE, Acting P. J.

DATO, J.

12